**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Richard OXENDINE,
Defendant-Appellant.**

No. 75–3352.

United States Court of Appeals,
Ninth Circuit.

March 10, 1976.

John P. Fadgen (argued), Las Vegas, Nev., for defendant-appellant.

Raymond D. Pike, Asst. U. S. Atty. (argued), South Las Vegas, Nev., for plaintiff-appellee.

OPINION

Before ELY and HUFSTEDLER, Circuit Judges, and SMITH,* District Judge.

PER CURIAM:

Defendant was convicted on two counts of interstate communication of threats in violation of 18 U.S.C. § 875(c). The threats were directed at one Smith, a Federal Communications Commission inspector. We hold that prosecutions under 18 U.S.C. § 875(c) do require proof of a transmission in interstate commerce.[1]

The only problem before the court is whether there was evidence from which a jury might find that the threats had in fact been transmitted across the Nevada state line into either Arizona or California. The defendant owned a transmitter with a measured output of three watts which was capable of sending messages 20 to 25 miles. The Arizona and California borders are 35 and 45 miles respectively distant from Las Vegas, the point of transmission.

---

* The Honorable Russell E. Smith, Chief Judge of the United States District Court for the District of Montana, sitting by designation.

1. The United States cites the case of *Gagliardo v. United States,* 366 F.2d 720 (9th Cir. 1966). The *Gagliardo* case was a prosecution for the transmission of obscenity under 18 U.S.C. § 1464. That section does not, as does 18 U.S.C. § 875(c), specifically require a transmission in interstate commerce, and *Gagliardo* is not in point here.

On April 20, 1975, at about 2:45 P.M., defendant was heard talking to the "California kid" located in what the Government witnesses assumed to be the Lake Mead area. Some parts of Lake Mead are in Arizona and some parts of it are in Nevada. Somewhat later on April 20th, but before 7:10 P.M., there were transmissions recorded between defendant and some unidentified person as follows:

"Hey how about it one more time Florida, how about that Bikini State,"

And, following a break, the following:

"Oh you got that double six [2], Las Vegas, Nevada, go ahead." (TR p. 107)

From this it is sought to be inferred that defendant was talking to someone in Florida.

A three-watt transmitter could, under proper skip conditions, send a signal much farther than the borders of Arizona and California. Skip phenomena occur when a radio signal bounces off of the ionosphere back to earth, and they are dependent upon the existence of particular atmospheric conditions. Skip conditions did prevail at 2:45 P.M. on April 20th, and if it be assumed from the references to "Florida" and "Bikini State" that defendant's signal was reaching Florida, it is consistent with the evidence that it did reach there by reason of a skip.

The Government does not attempt to support its case on the theory that by reason of a skip the signals in question were carried across a state line. However, the Government witnesses did not note the existence of skip conditions at the time of the 7:10 P.M. transmission on April 20th, or at any time on April 19th, and defendant testified that such conditions were not present.

If a linear amplifier were used in connection with the transmitter, the signals would reach a distance of 50 to 150 miles. There is evidence from which the jury might have found that on the dates of the threats the defendant did in fact own an amplifier. If the evidence supports a finding that the amplifier was being used in the broadcasts of April 19th and 20th, then the evidence was sufficient. Otherwise it was not.

Two FCC agents, who were monitoring the defendant's broadcasts, inspected his home on April 16, 1975, and neither was able to testify that a transmitter and an amplifier were being used in conjunction with one another on that date. The defendant testified that he owned an amplifier on April 19th and 20th and admitted that he had at times made use of it, and at one time said he was positive that it was not in line on April 19th and 20th. Later, in response to the direct question, "Do you know whether or not it was in line on the 16th?" he answered, "I doubt it." (TR p. 224) Later, to another question, "Mr. Oxendine, I'm merely trying to clarify this, you're positive you didn't have an amplifier on the 19th?" he responded, "I doubt very much if I had any amplifier hooked up on the 19th or the 20th." (TR p. 233)

The Government, in support of its case, relies on the testimony of Inspector Smith, testifying in rebuttal as follows:

Q  On the 16th was there, do you remember if there was a particular gauge that based upon experience in reading gauges and relative wattage that would indicate whether or not a power source or transmission was operating in excess of four watts?

A  Well, based on my experience, while we were locating the station, I observed that they had, a signal strength meter was indicating that it was a rather strong signal, probably more than four watt station; yes.

MR. PIKE: All right. I have nothing further.

Pardon me, what would that indicate if it were in excess of four watts?

A  That would indicate that the station was operating with either a transmitter that had higher output power than four watts or Linear Amplifier that put

---

2. The "double six" reference would have identified defendant to whoever was listening to his broadcast.

out more than four watts. (TR pp. 235–36)

The foregoing is the only evidence as to the output of the transmitter at any time prior to May 4. On cross-examination in the Government's case-in-chief, Smith had testified:

Q Now, at no time during either of these transmissions of the 19th or 20th did you gauge the strength of them; is that correct?

THE COURT: What do you mean by "gauge"?

MR. FADGEN: Measure.

A I don't really know what you mean. I'm still confused.

Q (By Mr. Fadgen) The power output, did you measure the power output of the transmissions of the 19th or 20th?

A The only way you can measure power output is by physically measuring it on the transmitter.

Q And you did not do that; is that correct?

A No. (TR pp. 106–07)

Montgomery, an agent who was monitoring the broadcast with Smith, testified in his cross-examination as follows:

A I stated that we did not make measurements because we did not have the equipment to make measurements with us at that time.

Q That's on the 19th?

A That was on the 16th.

Q The 16th. All right. When did you measure the output of the Oxendine radio?

A I did not measure the output.

Q (By Mr. Fadgen) Who did?

A From the time that we, our group was in Las Vegas, until the time we left, the output was not measured. I believe there might have been, I think there were some measurements made by some of the other engineers in corroboration with the FBI at a later time, but I was not involved in this. (TR pp. 49–50)

The reference to other engineers' acting in corroboration with the FBI refers to the measurements made on May 4th. It ap-pears to us that the Government witnesses, at the time of their testimony in the case-in-chief, were unwilling to rely on the signal strength meter as a measuring device. They both said that they had no equipment with which to measure signal strength. In light of the testimony which had been given in the Government's case-in-chief, we do not regard Smith's opinion, which stated only a probability of an output of more than four watts on April 16th, as sufficient to support a finding that there was in fact an output of more than four watts on that day.

The Government's case rests, therefore, on the fact that defendant did acquire the amplifier from which an intent to use can be inferred, the fact that at some time prior to trial the amplifier was used, the fact that the defendant's denial of use on April 19th and 20th was equivocal, and the fact that, after the event and on May 4th, the amplifier was connected to the transmitter. All of this does not, in our opinion, satisfy the Government's heavy burden of proving that on the two particular days, that is, April 19th and April 20th, the amplifier was in fact used.

The judgment of conviction is reversed, and the cause is remanded with directions to dismiss.